Filed 5/22/13  Starpoint USA v. Daewoo Motor CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STARPOINT USA, INC.<br><br>    Cross-Complainant and Appellant,<br><br>v.<br><br>DAEWOO MOTOR COMPANY, LTD.<br><br>    Cross-Defendant and Respondent. | No. B234891<br><br>(Los Angeles County<br>Super. Ct. No. TC017448) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cesar C. Sarmiento, Judge.  Reversed and remanded for further proceedings.

Duane Morris, William J. Baron, Colleen A. Cassidy and Cyndie M. Chang for Cross-Complainant and Appellant.

Lee, Hong, Degerman, Kang & Waimey, Larry R. Schmadeka, Eric D. Olson and Nilam J. Patel for Cross-Defendant and Respondent.

_____

# INTRODUCTION

Starpoint USA filed a breach of contract action alleging that Daewoo Motor Company was required to reimburse legal fees incurred in enforcing two indemnity agreements. Prior to trial, the court ruled that Starpoint could introduce extrinsic evidence to aid in the interpretation of the agreements. The jury reached a verdict finding that the parties intended the agreements to require Daewoo to reimburse Starpoint's claimed costs.

Daewoo filed a motion for new trial and a motion for judgment notwithstanding the verdict arguing that: (1) Starpoint had failed to introduce any competent extrinsic evidence in support of its interpretation of the agreement; (2) under the plain language of the agreement, Starpoint was not entitled to attorney's fees incurred in an action to enforce the agreement. The trial court granted both motions. We reverse the court's order granting judgment notwithstanding the verdict and affirm its order granting a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Starpoint's Complaint*

In 1997, Daewoo Motor Company (Daewoo) established Daewoo Motor America (DMA) to distribute Daewoo vehicles in the United States. On April 11, 2000, Daewoo and DMA included a written indemnity agreement in an audit letter which stated: "[Daewoo] has agreed to reimburse [DMA] for all product liability expenses, including fees and disbursements to legal counsel, experts, judgments, settlement amounts not covered by the insurance policies, and all other costs normally associated with the defense of product liability litigation relating to vehicles and parts purchased by DMA from [Daewoo]." DMA's accountant, KPMG, prepared the audit letter, which was then signed by Daewoo.

In April of 2003, KPMG prepared a second audit letter stating, in relevant part: ""[Daewoo] has agreed to indemnify and hold harmless [DMA] from any claim, demand,

2

or legal proceedings (including legal fees, costs and expenses related thereto) involving allegations of . . . bodily injury, or property damage allegedly caused by a defect in design, manufacture or assembly of [Daewoo] products or components thereof." Daewoo signed the letter on April 18, 2003.

Shortly thereafter, Michelle Bandy was injured while driving a Daewoo vehicle and filed a product liability action against Daewoo and DMA's successor in interest, Starpoint USA. Starpoint filed a cross-complaint alleging that that the audit letter agreements required Daewoo to indemnify all costs related to the Bandy Action. In June of 2005, Daewoo settled the Bandy action on behalf of all parties in the chain of distribution, including Starpoint.

Starpoint, however, proceeded with its cross-complaint, asserting that Daewoo had breached the 2000 and 2003 letter agreements by failing to reimburse: (1) legal expenses Starpoint incurred in the Bandy action prior to settlement; and (2) legal expenses Starpoint incurred in enforcing the indemnity provisions against Daewoo. Starpoint also alleged that Daewoo's actions constituted a breach of the implied covenant of good faith and fair dealing.

During pretrial proceedings, the parties disputed the meaning of the letter agreements and whether extrinsic evidence was necessary to aid in their interpretation. Starpoint asserted that language in the agreements requiring Daewoo to indemnify "all legal costs" related to a product liability claim necessarily included attorney's fees incurred in enforcing Starpoint's underlying indemnity rights. Alternatively, Starpoint argued that the court "should at least find that there is an ambiguity" as to whether the agreements were intended to require reimbursement of enforcement costs and "admit extrinsic evidence to clarify the ambiguity." It further contended that the court should "permit the jury" to resolve the ambiguity.

Daewoo, however, argued that "the unequivocal language of the Audit Letters" precluded Starpoint from recovering "attorneys fees and costs incurred in the prosecution of its indemnity claims." Daewoo further argued that, to the extent any "uncertainties or ambiguity existe[d]," Starpoint had failed to identify any extrinsic evidence "of any intent

3

or formation that would assist in determining the meaning of the purported terms in the Audit Letters . . . . As such, the Court must look [only] at the four corners of the document."

At a pretrial hearing, the court ruled that "there [was] ambiguity" as to whether the agreements required Daewoo to reimburse enforcement costs and that a jury should resolve the issue: "I think there is extrinsic evidence necessary to what is the intent of the parties on this issue regarding indemnity and attorneys fees. So I think that is what this trial is about, and that's where we have the disagreement. That's where the ambiguity begins."

### B. Trial and Verdict

#### 1. Witness testimony

At trial, Starpoint called two witnesses who provided testimony regarding the intended meaning of the letter agreements: Yeong Soo Hong, who was Starpoint's president and former chief financial officer, and Agnes Cha, who served as an in-house attorney.

On direct examination, Hong testified that the audit letters were intended to confirm that Starpoint did not need to set aside reserves for product liability exposure in their annual financial statements. Hong alleged that he directed Starpoint's accountant, KPMG, to draft the letters in a manner that would require Daewoo to reimburse all costs incurred in either defending a product liability action or enforcing the terms of the agreements. Hong further stated that, after KPMG drafted the letters, he sent them to Daewoo for signature.

On cross-examination, defense counsel asked Hong whether he had any conversations with Daewoo regarding the meaning of the letters:

COUNSEL: You did not have any discussions with [Daewoo] regarding this letter other than to sign it, is that right?

HONG: As you can see, the letter is more than ten years old. When such a letter was sent, we did have a mutual understanding about the product liability as

4

to who is responsible, so the party who is sending and the party who is receiving has sufficient understanding as to the liability.

COUNSEL:  Motion to strike, your honor.

COURT:  Hold on.  Overruled.  Ask your next question, please.

COUNSEL:  What I am asking you is, when this was sent to [Daewoo] in Korea, did you pick up the phone and talk to someone at [Daewoo] about the terms in the letter?

HONG:  Like I said, when I was sending the letter, I told them that, 'A letter is being sent to you.' But I don't remember as to whether or not I discussed content of this letter with someone else.

COUNSEL:  The best of your recollection, you only told them it was coming, 'Please sign it and return it'?

HONG:  I just told you that I cannot quite recall.

Hong also reiterated his view that the letter agreements were intended to include reimbursement of expenses incurred in both "defending" any product liability claim and "in making demands or prosecuting the claim if [Daewoo] didn't pay it."  In response to this assertion, defense counsel asked Hong why he believed the text of the agreements required reimbursement of enforcement costs.  Hong provided three reasons.  First, he said it was "common sense" that the manufacturer would "pay the product liability 100 percent."  Second, he asserted that if Starpoint did not believe it was entitled to costs incurred in enforcing the agreement, KPMG would have "mandated" that the company list "a reserve asset for that" in the annual financial statements.  Third, Hong stated that the agreements referenced "'all other costs normally associated with the defense of a product liability litigation.'"

At the conclusion of the cross-examination, defense counsel inquired again as to whether Hong had any "conversation with . . . Daewoo" regarding the "meaning or interpretation" of the language in the audit letters.  Hong responded: "Since this is the

5

common understanding as to the content of this letter, I don't have any recollection speaking."

On re-direct examination, Starpoint's attorney asked Hong to clarify his prior statements regarding his communications with Daewoo:

STARPOINT COUNSEL:  [Defense counsel] asked you whether you had a specific conversation about these letter agreements with someone at [Daewoo], and I believe your response was that you did not have a specific conversation about the letter agreements with [Daewoo] when you were sending this letter because you had conversations prior to the time you sent the letters, correct?

DAEWOO COUNSEL:     Objection.  Leading,

THE COURT:               Overruled.  You can answer.

HONG:                       Yes, that is correct.

STARPOINT COUNSEL:  And the bottom line is that [Daewoo] . . . agreed to reimburse you a hundred percent relating to product liability expenses.

HONG:                       Yes, that is correct.

STARPOINT COUNSEL:  Including legal fees for defending and including legal fees for going after them if they don't pay?

HONG:                       Correct.  It would include all the expenses.

Finally, on re-cross examination, defense counsel asked Hong:  "Is it your testimony that you had a specific conversation with people at [Daewoo] prior to the letters in which [Daewoo] specifically said that they would agree to pay you reimbursement for expenses,  legal expenses, incurred in going after [Daewoo] for product liability expenses?"  Hong responded: "I told you already that product liability responsibility would be borne by the manufacturer a hundred percent, and this is common knowledge between the parties, and there is no reason for [Daewoo] not to pay [Starpoint] the expenses that were incurred.  So when have a conversation between the parent company and subsidiary company, you will not list each and every case."

6

Starpoint's second witness, Agnes Cha, acknowledged on cross-examination that the audit letters did not contain any "express language" regarding enforcement costs. She also admitted that Starpoint's predecessor, DMA, had entered into agreements with other third parties that did have language "specifically . . . say[ing] that 'attorney's fees are recoverable in the enforcement of the rights of this agreement.'"

On re-direct examination, however, Cha testified that the intent of the letter agreements were to ensure that Starpoint recovered "100%" of its product liability costs, including any attorney's fees incurred in enforcing the agreements. She also stated that, in the absence of the letter agreements, she "th[ought]" Starpoint would "have to put a provision in the financial statement for exposure to legal fees for products liability."

Daewoo did not call any witnesses to rebut the testimony of Hong or Cha. In closing argument, however, defense counsel argued that neither audit letter contained "a promise to reimburse [Starpoint's] attorney's fees should they attempt to enforce this agreement." Counsel also argued that Starpoint could have included such language, as it had done in contracts with other parties. Finally, counsel reminded the jury that Hong had "no specific recollection of ever talking to [Daewoo]" about the meaning of the letter agreements.

### 2. Jury verdict

In a special verdict form, the jury made the following findings: (1) the letter agreements required Daewoo to "pay all legal expenses" that Starpoint incurred in defending the Bandy action; (2) the letter agreements required Daewoo to "indemnify Starpoint . . . for all attorney's fees and legal expenses incurred to enforce or prosecute the terms of the [agreements]"; (3) Starpoint had substantially complied with all of its obligations under the agreements; and (4) Daewoo had "unfairly interfere[d] with Starpoint['s] . . . rights to receive the benefits of the contract." The jury awarded damages to Starpoint of $57,667.28 for its legal expenses in the Bandy action.

On September 24, 2010, the court entered a judgment awarding Starpoint $57,667.28 for "attorney's fees and legal expenses in the underlying product liability

7

action, plus prejudgment interest and post judgment interest."  The judgment further stated that the amount of Starpoint's of recovery for "attorneys' fees and legal expenses incurred to enforce or prosecute the terms of the indemnity letter agreement against [Daewoo]" would "be determined at a later hearing . . . by the Court."

### C. *Post-trial motions*

#### 1. *Daewoo's motion for judgment notwithstanding the verdict and motion for new trial*

After the judgment was entered, Daewoo filed a motion for judgment notwithstanding the verdict (JNOV motion) and a motion for new trial challenging the portion of the verdict finding that it was required to reimburse Starpoint for legal costs incurred in enforcing the indemnity agreements.  In the JNOV motion, Daewoo argued – as it had before trial – that the plain language of the letter agreements "show[ed] conclusively, and as a matter of law, that Starpoint had no rights of indemnification as to an action to enforce the contract."  Alternatively, Daewoo argued that Starpoint had failed to introduce any extrinsic evidence "from which the jury could find that the intent of the parties was to extend the indemnity provision language used to indemnifying for enforcing the contracts terms."  According to Daewoo, Starpoint's witnesses had merely provided their subjective belief as to the meaning of the agreements, which was "irrelevant in determining the reasonable meaning of the words and acts of the parties."  Daewoo contended that these same arguments applied to Starpoint's claim for breach of the implied covenant of good faith and fair dealing.

Daewoo's motion for a new trial raised similar arguments, asserting that the trial court committed legal error when it permitted Starpoint to introduce parol evidence to aid in the interpretation of the agreements.  Daewoo also argued that the court should permit a new trial because the "[t]he weight of the evidence [wa]s against the finding that the audit letters provided for recovery of attorneys fees and costs in an action to enforce their provision."  According to Daewoo, Starpoint's trial evidence was "limited to self-serving expressions of [its] own subjective intent at the time of the drafting of the letters by its

own auditors. Starpoint presented no evidence, however, that such intent was ever communicated to [Daewoo] and that [Daewoo] had concurred with Starpoint thus resulting in a meeting of the minds." Daewoo argued that these same arguments applied to the jury's finding on the implied covenant claim: "given the insufficiency of the evidence to establish that the Audit Letters indemnified Starpoint for an action on the contract, it follows that the evidence is insufficient to establish that [Daewoo] deprived Starpoint of the supposed benefits of the contract and thus breached the implied covenant of good faith and fair dealing."[1]

In opposition, Starpoint argued that: (1) the court had already ruled that the letter agreements were ambiguous as to whether Daewoo was required to reimburse costs incurred to enforce the agreements; and (2) the extrinsic evidence at trial was sufficient to support the jury's finding that the parties intended the agreements to extend to such costs. In support of its second point, Starpoint contended that Hong had "offered . . . testimony" showing that "both [Daewoo] and Starpoint were fully aware that [Daewoo] would indemnify and reimburse all legal expenses relating to litigation involving Daewoo automobiles." The only extrinsic evidence Starpoint cited was testimony in which Hong stated that: (1) the parties had a "mutual understanding . . . as to the product liability [issue]"; and (2) if Starpoint did not believe the letter agreements required reimbursement of enforcement costs, its financial statements would have included a reserve for those costs.

---

[1] Daewoo's motion also argued that it was entitled to a new trial because the court had erred in instructing the jury and by refusing to admit findings and judgments entered in a related bankruptcy proceeding.

9

## 2. *The trial court's order granting Daewoo's motions for JNOV and new trial*

After a hearing, the court entered a written order granting both of Daewoo's motions. The order addressed the motion for new trial first, explaining that Starpoint had failed to provide any "competent" extrinsic evidence regarding the intended meaning of the letter agreements: "[T]he testimony of Mr. Hong and Ms. Cha is not competent parol evidence. Mr. Hong testified that he sent the Letter Agreements to [Daewoo] and asked them to sign and return the letters. [Citation.] Mr. Hong did not recall whether there were any discussions regarding the terms of the agreement prior to its execution. [Citation.] Thus, Mr. Hong's testimony did not provide any evidence of circumstances communicating [Starpoint's] subjective intent or negotiations between the parties that supports [Starpoint's] interpretation of the agreement. The testimony of Ms. Cha is similarly deficient. Ms. Cha was not a party to the negotiations or execution of the Letter Agreements, but had merely gained her knowledge from review of the agreements and its context. [Citation.] Evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language. [Citation.] Thus, [Starpoint] did not produce any competent parol evidence that supports its interpretation that the Letter Agreements were intended to include attorney's fee in an action to enforce the contract. Interpretation of the Letter Agreements is therefore a matter of law."

The court further concluded that, because Starpoint failed to introduce any competent extrinsic evidence, it was required to interpret the letter agreements based solely on their language. The court noted that, under the relevant case law, "an indemnitee [ordinarily] may not recovery [*sic*] attorney's fees incurred to enforce the indemnity agreement unless the indemnity agreement expressly or impliedly provides for an award of such fees. It is also the general rule that the inclusion of attorney fees as an item of loss in a third-party claim-indemnity provision does not constitute a provision for the award of attorney fees in an action to enforce the indemnity contract. [Citation.]"

The court ruled that, here, the parties' letter agreements did not contain any language "indicat[ing] an intent to award attorney's fees in an action to enforce the agreement. Rather, the Audit Letters merely state the obligation of [Daewoo] to

10

indemnify [Daewoo] for third-party products liability claims and breach of warranty claims. Moreover, neither Letter Agreement even makes any reference to the consequences of an action to enforce the contract. Thus, attorneys fees for enforcement of the agreement was not contemplated by the parties and are outside the scope of the Letter Agreements."

The court granted Daewoo's motion for JNOV on the same grounds, stating: "[Daewoo] argues that it is entitled to judgment notwithstanding the verdict because . . . [¶] there was no substantial evidence that Starpoint communicated an intent to have the audit letter extend the indemnity for enforcement and that [Daewoo] concurred with any such intent. The court agrees. As discussed above . . . in . . . the motion for new trial, Starpoint did not present any competent parol evidence to support its interpretation of the contract. A party's unexpressed subjective intent may not be considered in interpreting the contract. Accordingly, the motion for [JNOV] on this ground is [granted]."

### 3. *Starpoint's motions for reconsideration and to set aside the judgment*

Following the entry of the court's order, Starpoint filed a motion for reconsideration and motion to set aside the judgment asserting that "the extrinsic evidence presented at trial supports Starpoint's interpretation that the Letter Agreements provide for payment of enforcement costs. The evidence supports the jury's verdict in Starpoint's favor on this issue, and compels a denial of [Daewoo's] JNOV motion and its motion for new trial." Although Starpoint's motions essentially repeated the arguments it had made in opposition to Daewoo's motions for JNOV and new trial, Starpoint submitted additional trial testimony in support of its position. In particular, Starpoint highlighted testimony in which Hong stated that he had "conversations with Daewoo prior to . . . sen[ding] the letters" and that Daewoo had agreed to reimburse both "legal fees for defending and including legal fees for going after them if they d[id]n't pay."

In addition, Starpoint cited testimony in which Hong and Cha stated that if the letter agreements were not intended to require reimbursement of legal costs incurred in enforcement, KPMG would have mandated that Starpoint set aside a reserve for such

11

costs in its annual financial statements. Hong also testified that Daewoo reviewed and approved the financial statements, and therefore was aware that Starpoint was not setting aside reserves for future enforcement costs.

The trial court denied the motions, explaining: "In essence, Starpoint argues that the evidence of the parties' intent was sufficient to support the jury's finding in the special verdict. However, this again rests on whether or not the testimony of Mr. Hong and Ms. Cha were competent parol evidence. Starpoint again argues that there was a dispute regarding extrinsic facts and that the trial testimony of Mr. Hong and Ms. Cha state that they communicated their understanding that the agreement provides for enforcement costs. [¶] However, as this Court has already explained, the testimony of Mr. Hong and Ms. Cha do not constitute competent parol evidence. [¶] . . . [¶] The citations to the testimony of Mr. Hong cited by Starpoint in its moving papers do not compel a different result. Mr. Hong simply stating that the parties had a mutual understanding is insufficient. None of Mr. Hong's testimony cited in the motion shows that Mr. Hong communicated his intent in entering into the agreement nor do they support Starpoint's interpretation of the agreement."

On June 29, 2011, the court entered a "Judgment on Special Verdict and Pursuant to Rulings in Favor of [Daewoo] for its Motion for Judgment Notwithstanding the Verdict and Motion for New Trial." The judgment affirmed the portion of the special verdict requiring Daewoo "to pay the sum of $57,667.28 for Starpoint's attorney's fees and legal expenses in the underlying product liability action." The judgment further stated that, "[p]ursuant to the court's ruling [granting Daewoo's] Motion for Judgment Notwithstanding the Verdict and . . . Motion for New Trial, . . . it is hereby adjudged . . .[that] Starpoint shall take nothing on its claim that . . . [Daewoo] breached the contract with respect to recovery of Attorney Fees and costs in Starpoint's action to enforce the contract; and Starpoint take nothing on its claim that [Daewoo] breached contractually the implied covenant of good faith and fair dealing." Starpoint filed a timely appeal of the trial court's order granting Daewoo's motions for new trial and JNOV and the portion of the judgment reflecting those rulings.

12

Starpoint argues that we must reverse the trial court's order granting a JNOV and new trial because the jury's finding that the parties intended the letter agreements to require Daewoo to reimburse "attorney's fees and legal expenses incurred to enforce or prosecute the terms of the [agreements]" was supported by substantial evidence. As discussed in more detail below, Starpoint does not challenge the trial court's ruling that, in the absence of competent extrinsic evidence clarifying the parties' intent, the language of the letter agreements would not require Daewoo to reimburse enforcement costs. It asserts, however, that the trial court erred in concluding that the extrinsic evidence at trial was insufficient to support the jury's interpretation of the contract.

Because an order granting a motion for JNOV and an order granting a motion for new trial are subject to significantly different standards of review, we address the trial court's grant of each motion separately.

### A. *The Trial Court Erred in Granting Daewoo's Motion for Judgment Notwithstanding the Verdict*

#### 1. *Legal standards applicable to a judgment notwithstanding the verdict*

""""The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations.]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]"' [Citation.]" (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 226-227 (*Sole Energy*).)

13

"'In passing upon the propriety of a judgment notwithstanding the verdict, appellate courts view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom the judgment notwithstanding the verdict was awarded. [Citations.] In other words, we apply the substantial evidence test to the jury verdict, ignoring the judgment.' [Citation.]" (*Sole Energy, supra,* 128 Cal.App.4th at p. 227.) If, however, the "appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, . . . our review is de novo. [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138 (*Wolf*).)

### 2. *The trial court did not err in permitting Starpoint to introduce extrinsic evidence of the parties' intent*

Before assessing whether substantial evidence supported the jury's findings, we first address Daewoo's assertion that we should affirm the JNOV because, as a matter of law, the letter agreements cannot be reasonably interpreted to require reimbursement of attorney's fees incurred in enforcing the agreements. Prior to trial, the court ruled that the letter agreements were ambiguous on this issue and permitted Starpoint to introduce extrinsic evidence regarding "the intent of the parties." Daewoo, however, contends that the trial court should have never permitted the trial to hear any extrinsic evidence because the agreements unambiguously preclude Starpoint from recovering enforcement costs.

A court must interpret a contract to give effect to the mutual intent of the parties at the time the contract was formed. (Civ. Code, § 1636.) "Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ['[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . .']; Civ. Code, § 1638 [the 'language of a contract is to govern its interpretation . . .'].) [¶] The court generally may not consider extrinsic evidence . . . to vary or contradict the clear and unambiguous terms of a written . . . contract. [Citations.] Extrinsic evidence is

14

admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Wolf, supra*, 162 Cal.App.4th at p. 1126.)

"The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' [Citation.]" (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).) As explained by the California Supreme Court: "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility . . . exists whenever the parties' understanding of the words used may have differed from the judge's understanding." (*Pacific Gas & E. Co. v. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40.)

"The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract." (*Winet, supra,* 4 Cal.App.4th at p. 1165.) In this case, the court concluded that the letter agreements were reasonably susceptible to the interpretation set forth by Starpoint and permitted extrinsic evidence.

We agree that that the letter agreements are ambiguous as to whether the parties intended to require Daewoo to reimburse attorney's fees incurred in enforcing the agreements. The April 2000 letter states, in relevant part, that Daewoo "has agreed to reimburse all product liability expenses, including fees and disbursements to legal counsel . . . relating to vehicles and parts purchased by [DMA] from [Daewoo]." The phrase "all product liability expenses, including . . . disbursements to legal counsel"

15

might be reasonably construed as extending to legal fees incurred to enforce the agreement. Such costs would not have been incurred but for a product liability claim, and therefore might be reasonably characterized as a "product liability expense." Moreover, the April 2000 letter agreement contains no language that expressly precludes the award of legal fees incurred in enforcing the agreement.

The April 2003 letter contains similar language stating, in relevant part, that Daewoo "has agreed to indemnify . . . [DMA] from any claim . . . (including legal fees, costs, and expense related thereto) involving allegations of . . . bodily injury or property damages allegedly caused by . . . [Daewoo] products." Again, the language requiring Daewoo to indemnify all "legal fees, costs and expenses" "related" to a product liability claim might be reasonably construed as including legal expenses Starpoint incurred in enforcing Daewoo's indemnity obligations. Such expenses were ultimately incurred as a result of a product liability claim and were therefore arguably "related" to the product liability claim. Moreover, as with April 2000 letter, the April 2003 letter contains no language that expressly precludes the reimbursement of such fees.

Daewoo, however, contends that several cases have considered indemnity agreements with similar language and concluded that they did not require reimbursement of attorney's fees incurred to enforce the agreements. For example, in *Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14 (*Carr*), the parties disputed whether the following provisions extended to legal expenses incurred in enforcing the agreement: "[Carr] shall indemnify and hold harmless [Chowchilla] . . . from and against all claims, damages, losses and expenses including attorney fees arising out of the performance of the work described herein . . ." (*Id*. at p. 19.) The court concluded that although, "[a]t first glance, the language . . . seem[ed] to extend beyond [costs associated with the] third-party claims[,] . . . relevant case authority suggest[ed]" the agreement could not be read so broadly. (*Id*. at p. 20.)

The court reviewed three cases – *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949 (*Myers*), *Meininger v. Larwin–Northern California, Inc.* (1976) 63 Cal.App.3d 82 (*Meininger*) and *Campbell v. Scripps Bank*

(2000) 78 Cal.App.4th 1328 (*Campbell*) – that considered whether an indemnification agreement requiring reimbursement of legal fees "arising out of" or "related to" the performance of certain duties extended to legal fees incurred in enforcing the agreement. (See *Myers, supra,* 13 Cal.App.4th at pp. 963-964 [indemnifying "all claims . . . and expenses, including . . . attorney's fees, arising out of . . . the performance of the Work"]; *Meininger, supra,* 63 Cal.App.3d at p. 84 [indemnifying "any . . . claims . . . , including counsel or attorneys' fees . . . which may arise directly or indirectly from the performance of this Contract']; *Campbell, supra,* 78 Cal.App.4th at p. 1336 [indemnifying "claims, . . . including . . . reasonable attorneys fees . . . which arise . . . from . . . or relate to this escrow"].) In all three decisions, the courts concluded that the agreements did not "allow[] recovery of [enforcement] fees." (*Carr, supra,* 166 Cal.App.4th at pp. 21-22.) The *Carr* court contrasted those decisions with *Baldwin Builders v. Coast Plastering Corp*. (2005) 125 Cal.App.4th 1339 and *Continental Heller Corp. v. Amtech Mechanical Services, Inc*. (1997) 53 Cal.App.4th 500, which ruled that such fees were recoverable where the contract included express language for ""attorney's fees incurred in enforcing [the] indemnity agreement."' [Citation.]" (*Carr, supra,* 166 Cal.App.4th at p. 23.)

The *Carr* court concluded that that the language of the indemnity provision under consideration "more closely parallel[ed] the language found in *Myers, Meininger, and Campbell*, than the language examined in *Baldwin* and *Continental*. Unlike in *Baldwin*, there is no express language authorizing recovery of fees in an action to enforce the contract." (*Carr, supra*, 166 Cal.App.4th at p. 23.)

Daewoo asserts that *Carr* is the latest in "a long line of established authorities holding that," in the absence of language expressly authorizing recovery of fees in an action to enforce the contract, "standard third party indemnity language . . . may not be construed to grant any right to recover attorney fees incurred in the enforcement of the indemnity agreement."

Although Starpoint acknowledges that the contractual language at issue in *Carr*, *Myers*, *Meininger* and *Campbell* cannot be meaningfully distinguished from the language in the letter agreements here, it correctly asserts that in none of those decisions did the

17

parties submit extrinsic evidence. Moreover, none of the decisions addressed whether extrinsic evidence could have been properly admitted to aid in the interpretation of the agreements. Thus, the limited issue decided in those cases was whether the language of the indemnity agreements, considered without the benefit of extrinsic evidence, were properly interpreted as requiring reimbursement of fees incurred to enforce the agreement. The issue here, however, is whether the letter agreements were "reasonably susceptible" to such an interpretation, thereby supporting the admission of extrinsic evidence.

For the reasons explained above, we conclude that the letter agreements were at least reasonably susceptible to Starpoint's interpretation. The trial court's admission of extrinsic evidence was therefore proper.

### 3. *Starpoint introduced substantial evidence that the parties intended the letter agreements to include reimbursement of enforcement costs*

The court granted Daewoo's motion for JNOV because it concluded that Starpoint failed to introduce any "competent" extrinsic evidence regarding the parties' intended meaning of the letter agreements. (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [interpretation of a written contract is "solely a judicial function . . . when a determination was made based on incompetent [extrinsic] evidence. [Citation.]"].) In particular, the court concluded that Starpoint's witnesses had merely described their own subjective understanding of the letter agreements without offering any evidence that they had "communicat[ed]" this intent to Daewoo. According to the court, Starpoint's President, Yeong Soo Hong, testimony showed only that: (1) he had sent Daewoo the letter agreements for signature; and (2) he could not recall whether he had any discussions with Daewoo regarding the meaning of the letters prior to their execution. The court concluded that none of the other witnesses provided any testimony related to discussions with Daewoo.

Starpoint does not dispute that "'[e]vidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language.'" (*Salehi v.*

18

*Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1159 (*Salehi*) ["'[e]vidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language'"]; *Winet, supra,* 4 Cal.App.4th at p. 1165, n. 3 [witness's "testimony as to what he subjectively understood and intended the [contract] to encompass . . . was not competent extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language"].) It argues, however, that it presented substantial evidence from which the jury could reasonably infer that Hong did in fact communicate his understanding of the letter agreements to Daewoo and that Daewoo shared his understanding. We agree.

"The testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding." (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 171.) At trial, Hong testified that, when he sent the letters the Daewoo, the parties "ha[d] a mutual understanding" that Daewoo was required to reimburse any legal costs incurred in enforcing the agreements. Hong also testified that: (1) he had conversations with Daewoo about the letter agreements before they were signed; and (2) Daewoo specifically "agreed to reimburse . . . a hundred percent relating to product liability expenses," which included both "legal fees for defending and . . . legal fees for going after them if they don't pay."

Under the "highly deferential" substantial evidence standard (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128, Hong's testimony was sufficient to support the jury's finding that the parties intended the agreements to require reimbursement of legal expenses incurred in enforcing those agreements. Considered in the light most favorable to the verdict, a jury could legitimately infer from Hong's testimony that, before entering into the letter agreements, he had conversations during which Daewoo agreed it would indemnify enforcement costs.

As the trial court observed, it is true that other portions of Hong's testimony raise questions as to whether he did in fact engage in any such discussions. During his

19

cross-examination, Hong repeatedly stated that he could not recall whether he had any conversations with Daewoo regarding the meaning of the letter agreements. He also stated that such conversations would have been unnecessary because it was "common sense" that Daewoo would reimburse the costs of enforcing the indemnity agreements. Under the "substantial evidence rule," however, we "must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict." (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1285.) "'[E]ven testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (*New v. New* (1957) 148 Cal.App.2d 372, 384.)

4. *The court erred in granting JNOV on Starpoint's implied covenant claim*

In its motion for JNOV, Daewoo argued that because Starpoint had presented no evidence supporting the jury's finding that the letter agreements required reimbursement of enforcement costs, the court must also grant a JNOV on Starpoint's breach of the implied covenant claim, which alleged that Daewoo had "'unfairly interfere[d ]with Starpoint's right to receive'" this contractual benefit.

The court's written order states that it "agreed" with Daewoo on this issue. The final judgment reflects this finding, stating that Starpoint shall "take nothing on its claim that [Daewoo] breach . . .the implied covenant . . ." Based on the text of the order and final judgment, it appears that the court entered a JNOV on Starpoint's implied covenant claim based on its finding that that the jury's interpretation of the letter agreements was not supported by substantial evidence.[2] Because we conclude that substantial evidence

---

[2] The court's written order, however, also stated that "the error was not prejudicial" because Starpoint "did not recover any damages on the breach of the covenant claim that were not independently recoverable under the breach of contract claim." Despite that finding, the language in the final judgment indicates that the court entered judgment against Starpoint on the claim.

20

did support the jury's finding on that issue, we also reverse the court's grant of JNOV on Starpoint's implied covenant claim.

## B. *The Trial Court Did Not Abuse its Discretion in Granting the Motion for New Trial*

Daewoo 's motion for new trial raised essentially the same argument set forth in its motion for [JNOV]. Specifically, Daewoo contended that the trial should permit a new trial pursuant to Code of Civil Procedure section 657, subdivision (6) because the "weight of the evidence" showed that Starpoint had never "communicated" its "subjective intent" to Daewoo at any time prior to the execution of the letter agreements. The trial court granted Daewoo's motion for new trial for the same reasons it granted the JNOV. Specifically, the court ruled that: (1) Starpoint's extrinsic evidence showed only its "undisclosed subjective" understanding of the letter agreements, which was "irrelevant to determining the meaning of contractual language"; (2) in the absence of any "competent parol evidence," interpretation of the letter agreements was a question of law; and (3) the plain language of the letter agreements did not "obligate [Daewoo] to pay attorney's fees in actions to enforce the contract."

On appeal, Starpoint contends that because the record contains "credible evidence of the contracting parties' intent . . ." , the trial court "erred in taking this issue from the jury . . ."

### 1. *Summary of applicable law and standard of review*

"[T]he function of a new trial motion is to allow a reexamination of an issue of fact. . . . Unlike . . . judgments notwithstanding the verdict[,] . . . . granting a new trial does not entail a victory for one side or the other. It simply means the reenactment of a process which may eventually yield a winner. Accordingly, the judge has much wider latitude in deciding the motion." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department* (1998) 67 Cal.App.4th 743, 751 (*Fountain Valley*).)

Code of Civil Procedure section 657 sets forth the exclusive grounds for granting a new trial. (See *Neal v. Montgomery Elevator Co*. (1992) 7 Cal.App.4th 1194, 1198.)

21

Section 657, subdivision (6) permits the court to order a new trial on all or part of the issues based on "[i]nsufficiency of the evidence to justify the verdict or other decision . . . ." "Insufficiency of the evidence in this context means an absence of evidence or that the evidence received, in the individual judgment of the trial judge, is lacking in probative force to establish the proposition of fact to which it is addressed." (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 215.) In making this assessment, the trial court is permitted to "disbelieve witnesses, reweigh evidence and draw reasonable inferences contrary to that of the jury. . . " (*Fountain Valley, supra*, 67 Cal.App.4th at p. 751.) On appeal, "an order granting a new trial upon the ground of the insufficiency of the evidence . . . shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." (Code of Civ. Proc., § 657.)

A ruling on a motion for a new trial is "generally review[ed] . . . for abuse of discretion." (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1614.) In *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, the California Supreme Court clarified the highly deferential standard of review applicable to a new trial order predicated on insufficiency of the evidence: "[The] order . . . 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory. [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' [Citation.] [¶] . . . [¶] The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. [Citation.]" (*Id.* at p. 412.) "[G]iven the latitude afforded a judge in new trial motions, orders granting new trials [based on insufficiency of the evidence] are 'infrequently reversed.'" (*Fountain Valley*, *supra*, 67 Cal.App.4th at p. 751.)

### 2. *The trial court did not abuse its discretion in granting a new trial based on insufficiency of the evidence*

The trial court's order indicated that it had granted the motion for new trial upon the ground of insufficiency of the evidence: "[Starpoint] did not produce any competent parol evidence that supports its interpretation that the Letter Agreements were intended to include attorney's fees in an action to enforce the contract." The order also provided a statement of reasons for the decision, explaining that Starpoint's evidence did not establish that it had communicated its subjective understanding subjective understanding of the letters to Daewoo. The court noted that Hong had testified that he could not recall having any conversations with Daewoo regarding the letter agreements, while Cha "was not a party to the negotiations or execution of the Letter Agreements, but had merely gained her knowledge from review of the agreements." In the court's view, this testimony did not qualify as "competent parol evidence" because "the undisclosed subjective intent of the parties [wa]s irrelevant to determining the meaning of contractual language."

Starpoint contends that we must reverse the trial court's order because the evidence at trial was sufficient to support an inference that Starpoint did communicate its subjective understanding of the letter agreements to Daewoo. In effect, Starpoint asserts that because substantial evidence supported the jury's interpretation of the letter agreements, the court should have denied the motion for new trial. This assertion overlooks the different tests applicable to a motion for JNOV and a motion for new trial. In evaluating the motion for JNOV, the trial court was prohibited from weighing the evidence or assessing credibility, and was tasked with determining whether there was any substantial evidence, contradicted or uncontradicted, to support the jury's verdict. But, when it came to the motion for new trial, the court was permitted to weigh the evidence, consider the credibility of witnesses, and determine whether the weight of the evidence went against the jury's verdict. (*Casella v. Southwest Dealer Services* (2007) 157 Cal.App.4th 1127, 1159-1160.) Moreover, the trial court was free to draw inferences

23

from the evidence different from those the jury accepted.  (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 379.)

Starpoint attempts to avoid this deferential standard of review by asserting that the court's "conclusion that . . . the proffered extrinsic evidence was not competent evidence of the parties' mutual understanding of their contracts" involved a question of law that we review de novo.  While it is true that an order granting a new trial based on an issue of law is reviewed under the de novo standard (see *Doe v. United Airlines, Inc.* (2008) 160 Cal.App.4th 1500, 1505), the order here was clearly predicated on the court's factual finding that Starpoint failed to prove it communicated its subjective understanding of the agreement to Daewoo.  Accordingly, we must affirm the court's order "unless [Starpoint] demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory. . . ."  (*Lane, supra,* 22 Cal.4th at p. 412.)  Starpoint has made no such showing.

As discussed above, Hong was the only witness who testified as to communications between Daewoo and Starpoint.  During cross-examination, Hong repeatedly stated that he could not recall whether he had any discussions with Daewoo regarding the terms of the letter agreement.  During his re-direct examination, however, he stated that he had in fact spoken with Daewoo prior to entering into the letter agreements and that Daewoo agreed it would reimburse legal fees incurred in enforcing the agreement.  Finally, on re-cross examination, defense counsel asked Hong again whether he "had a specific conversation . . . in which Daewoo . . . specifically said that they would agree to . . . reimburse[] . . .  legal expenses, incurred in going after Daewoo Motor Korea for product liability expenses?"  In response, Hong said he did not have to tell Daewoo "each and every case" that was covered by the letter agreements because it was "common knowledge" that a manufacturer would pay for any costs associated with enforcing a product liability indemnity agreement.  In light of this inconsistent testimony, a reasonable trier of fact could conclude that Hong did not have any conversation with Daewoo about his subjective understanding of the contracts.

24

Starpoint contends that, in addition to Hong's testimony, evidence of the parties' conduct unequivocally shows they mutually agreed that the letter agreements were intended to require reimbursement of legal fees incurred in enforcing the agreements. Hong and Cha testified that if Starpoint or KPMG did not believe those fees were covered by the letter agreements, KPMG would have required Starpoint to list a reserve for such fees on its annual financial statements. Hong further testified that Daewoo reviewed the financial statements and never asserted that Starpoint should include reserves for costs associated with enforcing the letter agreements. Starpoint contends this "evidence of the parties' conduct" shows they shared a mutual "understanding of the Letter Agreements . . . – namely that, that [Starpoint] had no exposure for enforcement costs."

To the extent this evidence is even relevant to demonstrating the meaning Daewoo ascribed to the letter agreements, it is certainly not sufficient to reverse the trial court's order granting a new trial. Starpoint produced no evidence showing that Daewoo shared its belief that a financial statement would normally include a reserve for future costs of enforcing an indemnity provision. Nor did it introduce any expert testimony suggesting that a financial statement should normally include such a reserve. Without such evidence, Hong and Cha's testimony about Starpoint's financial statements merely serve as additional evidence of their own, undisclosed subjective understanding of the contract.

Because a reasonable trier of fact could have concluded that Starpoint failed to provide any competent extrinsic evidence regarding the parties' intent, the court did not abuse its discretion in granting a new trial on the jury's finding that Daewoo breached the letter agreements by failing to reimburse Starpoint for attorney's fees incurred in enforcing the agreements. Nor did the court abuse its discretion in granting a new trial on Starpoint's breach of the implied covenant claim, which was predicated on this same alleged breach of the letter agreements.[3]

---

[3]     Daewoo filed a "protective" cross-appeal to the portion of the jury verdict and original judgment finding that it breached the letter agreements by failing to reimburse

25

**DISPOSITION**

The judgment and the court's order granting Daewoo judgment notwithstanding the verdict are reversed. The trial court's order granting a new trial on the jury's finding that Daewoo breached the letter agreements by failing to reimburse Starpoint's enforcement costs and breached the implied covenant of good faith and fair dealing is affirmed. Because the parties have not appealed the portion of the verdict finding that Daewoo breached the letter agreements by failing to reimburse Starpoint for legal expenses incurred in defending against the Bandy Action, no retrial on that issue is required. Each party shall bear its own costs on appeal.


                                        ZELON, J.

We concur:


        PERLUSS, P. J.


        WOODS, J.

---

Starpoint for attorney's fees incurred in enforcing the agreements. Daewoo asserts that the jury's finding on this issue was caused, in part, by various instructional and evidentiary "errors" that were subsequently "rendered moot by the trial court's order granting [the' [n]ew [t]rial and JNOV motions." Because we affirm the trial court's order granting a new trial, which vacates the portion of the jury verdict and original judgment to which Daewoo objects, we need not address the issues raised in the cross-appeal.

26