[No. B028431. Second Dist., Div. Seven. July 19, 1989.]

ALLISON J. DOMINGUEZ, Plaintiff and Respondent, v.
ELOISE VIOLET PANTALONE, Defendant and Appellant.

---

COUNSEL

Peter Abrahams, David M. Axelrad and Horvitz & Levy for Defendant and Appellant.

A. Tod Hindin for Plaintiff and Respondent.

---

## OPINION

**LILLIE, P. J.**—Plaintiff sustained hearing loss and significant permanent brain injuries when his motorcycle collided with defendant's car, which made a left turn in front of him. After a trial which lasted about two weeks, the jury rendered its special verdict finding defendant wholly at fault for the accident and determining the total amount of plaintiff's damages to be $1,557,400. Defendant's motion for a new trial was denied. She appeals from the judgment. Her primary contention on appeal is that the repeated attempts of plaintiff's attorney to elicit an opinion on fault from the investigating officer, who was not a witness to the collision, constituted misconduct that deprived her of a fair trial.

### FACTS

In May 1981, defendant, driving her automobile in an eastbound direction on Sepulveda Boulevard, was in the process of making a left turn onto Cabrillo Avenue and had almost completed her turn when the rear passenger (right) side of her car collided with plaintiff's motorcycle traveling westbound on Sepulveda in the lane nearest the curb. The posted speed limit was 40 miles per hour. Upon impact, plaintiff's helmet flew off, his body

was thrown into the air, and when it came down his head hit the pavement. Defendant's car came to rest up over the curb on Cabrillo. Plaintiff, who was then 17 years old, has no recollection of the collision.

According to defendant, she was stopped in the left turn pocket on Sepulveda waiting to turn north onto Cabrillo; when the light turned green, she checked the intersection and the approaching streets; she saw two vehicles traveling towards her westbound on Sepulveda, at the top of a rise in the road about 365 feet away; she determined that the cars were too far away to constitute a hazard and made her left turn at about 15 miles per hour; she did not see the motorcycle prior to the collision.

Six eyewitnesses gave different versions of the movements of the plaintiff's and defendant's vehicles prior to the impact. Michael Warkentin, who was 14 years old at the time, was in the rear seat of his family's passenger van which was westbound on Sepulveda and the second vehicle in the left turn pocket to southbound Cabrillo; he first heard and then saw plaintiff's motorcycle come over the rise on Sepulveda in the lane nearest the curb at about 40 to 45 miles per hour; he saw defendant's car start to make a left turn, pull out a few feet and stop; he heard plaintiff sound his horn and slow down and try to change lanes to get out of the way of the car; at the time of impact, the motorcycle was traveling 20 or 25 miles per hour, and defendant's car was traveling 5 or 10 miles per hour; right before impact, defendant's car came to a stop blocking the two westbound lanes of Sepulveda nearest the curb; after plaintiff was thrown into the air, his helmet came off.

The driver of the van, Christine Warkentin, Michael's mother, heard a horn honk and first saw the motorcycle traveling at about 30 or 40 miles per hour in the lane nearest the curb and a little to the rear of the van; the motorcycle entered the intersection at about 20 or 25 miles per hour.

Stacy Trevino, Michael's sister, also a passenger in the van, first saw defendant's car stopped halfway across the crosswalk prepared to turn left; she heard the motorcycle and then turned to see it "flash by" the van at about 30 or 40 miles per hour; when she looked back at defendant's car it was turning in front of the westbound lane of Sepulveda nearest the curb; the motorcycle hit the back end of the car.

Theodore Marcoux was traveling eastbound on Sepulveda and was going about 10 or 15 miles per hour through the intersection with Cabrillo when he saw the motorcycle begin to enter the intersection; defendant's large American car was blocking all three westbound lanes of Sepulveda; plaintiff's eyes were locked onto the car and he was frozen on the steering wheel; he was of the opinion that plaintiff could have avoided the collision because

he could have gotten into another westbound lane on Sepulveda; he disagreed with Michael Warkentin's estimate of 20 to 25 miles per hour as the speed of the motorcycle at impact but he did not observe the motorcycle long enough to make his own estimate of its speed.

De Ann Marie Young called by defendant, gave confusing testimony that she was traveling westbound in the middle lane or the lane nearest the center divider of Sepulveda at about 30 miles per hour; somewhere between the crest of Sepulveda and the intersection, plaintiff's motorcycle passed her at about 70 miles per hour and was traveling at about 60 or 70 miles per hour at the point of impact. In her deposition in 1982, Ms. Young testified that plaintiff was not wearing a helmet, that she did not see the motorcycle before the impact, the motorcycle made a left turn in front of defendant's car, and the motorcycle hit the front of defendant's car. In her deposition, she also mixed up the directions of the vehicles at the beginning of the deposition and changed it later on, and at one point testified that defendant was traveling in the same direction in front of her. She further testified that she has a slight dyslexia, which causes her to mix up left and right, east and west. Ms. Young also testified that at the scene of the accident defendant told her that her (defendant's) husband had just died; Ms. Young told defendant that she would be a witness for her.

The deposition testimony of Merlin Arthur Raven was offered by defendant and read to the jury, as he was unavailable for trial. Mr. Raven testified that he was a passenger in a car traveling 40 miles per hour westbound on Sepulveda in the middle lane when, right before the rise in the road, the motorcycle passed him on the left. It took about three seconds for the motorcycle to pass him. He first saw defendant's car turning at about five miles per hour and blocking two westbound lanes on Sepulveda; about three seconds later, when defendant had almost completed her turn, the accident occurred. Raven estimated plaintiff's speed at a distance of about 100 feet from defendant's car to be about 60 miles per hour. Raven concluded that plaintiff saw the car before impact because he saw plaintiff shake his head from left to right about 20 feet from the intersection. Raven did not see the motorcycle skid or slide before impact nor did he hear any screeching of tires.

An expert in mechanical engineering testified for the plaintiff that, based on the damage to the vehicles and Michael Warkentin's version of the accident, the motorcycle was traveling at about 20 to 25 miles per hour on impact with the defendant's car. An engineering expert testified for the defense that from his examination of the damage to the vehicles, he concluded that the speed of the motorcycle at impact was between 33 and 38 miles per hour; also, from his study of human factors in accident

reconstruction, the speed estimates of persons traveling in the same direction as the motorcycle and who had a longer period of time to evaluate the motorcycle's speed would be more accurate. Inasmuch as no issue of damages is raised on this appeal, we do not summarize the lengthy testimony thereon.

By special verdict, the jury found, 11 to 1, that defendant was negligent, that such negligence was a proximate cause of the accident, that plaintiff was not negligent, and that the total amount of damages suffered by plaintiff as a result of the accident was $1,557,400. Judgment was entered against defendant and in favor of plaintiff. Defendant thereafter moved for new trial on the ground, inter alia, of insufficiency of the evidence to support the verdict, and on the ground that prejudicial misconduct of plaintiff's attorney in seeking to introduce into evidence Police Officer Stephen Gilliam's opinion of fault deprived her of a fair trial. The court denied the motion for new trial.

Defendant filed timely notice of appeal from the judgment. On appeal, she makes two primary arguments: (1) She was deprived of a fair trial as a result of "blatant and persistent misconduct by plaintiff's counsel," and (2) the trial court "improperly denied a new trial after concluding the jury had wrongly decided this case."

I

## No Misconduct of Counsel

Appellant contends that plaintiff's counsel, Mr. Hindin, was guilty of prejudicial misconduct in attempting, at several opportunities, to bring the investigating officer's opinion of fault before the jury after the trial court expressed its doubts that such opinion was admissible.

The following events occurred at trial before the acts appellant claims to be misconduct: In plaintiff's opening statement, Mr. Hindin stated, "We expect testimony from the investigating police officer who has had considerable experience in investigating accidents such as this sort and is an expert in that. His testimony will express the opinion that the cause of the collision was the unsafe left turn of the defendant in violation of the right of way of the plaintiff."

After the opening statements of both plaintiff and defendant, and out of the presence of the jury, defendant made a motion in limine with respect to the opinion of Officer Gilliam on the ground that his opinion embraced the ultimate issue of fault, which was for the jury to decide. The court contin-

ued the motion so plaintiff's counsel could give defense counsel written points and authorities on the issue. The next day the court and the parties again discussed the issue, and the court deferred ruling thereon until Gilliam testified as to his qualifications and the bases for his opinion. Defense counsel argued that Gilliam could not testify as to the issue of fault under Evidence Code section 805 because it is a legal conclusion for the jury to decide.[1] The court stated, "Well, no, but the Evidence Code does say he can testify to ultimate facts," and then soon thereafter, "It will all depend on how the evidence goes. . . . [¶] I won't permit him to be asked that question unless I am convinced that there is sufficient evidence upon which an expert could give such an opinion."

Appellant claims that the following conduct of Mr. Hindin constitutes misconduct:

## 1. *Plaintiff's Case-in-chief*

On the third day of testimony, Officer Gilliam was called by plaintiff. After eliciting Gilliam's background and experience in accident investigation, plaintiff asked Gilliam whether, based on the physical evidence and three witness statements, he had formed an opinion as to whether defendant had made an unsafe left turn. The court sustained defendant's objection and stated that there had not been sufficient expertise shown here and that the question was an incomplete hypothetical in that it did not include all the relevant evidence. The court also indicated that Gilliam did not have sufficient competence to give an expert opinion as to the ultimate fact of causation of the accident or negligence. At a sidebar conference, the court again explained its ruling to plaintiff's counsel, and also referred to Evidence Code section 352, stating, "[T]o allow him [to express] an opinion based on the evidence here would be grossly prejudicial." Thereafter, plaintiff quickly concluded his direct examination of Officer Gilliam.

## 2. *Defense Case*

About seven days of testimony and over twenty witnesses later, Officer Gilliam was called as a defense witness. Mr. Hindin's first question to the officer on cross-examination was whether he formed an opinion that "the motorcycle did present a hazard to the [defendant's] vehicle before she started her—" Before Mr. Hindin could finish his question, defense counsel objected. After a brief discussion, the court stated, "Oh, what witnesses told

---

[1] Evidence Code section 805 provides: "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."

him or didn't tell him, you are not asking that question. . . . " Without the court ruling on the objection, Mr. Hindin reframed his question: "Based on what the witnesses told you, did you form an opinion as to whether or not the . . . motorcycle posed a hazard . . . at the time the Pantalone vehicle started to make a left turn?" Defense counsel made an objection which was sustained. The court told Mr. Hindin, "You are asking him the ultimate fact. That's the one for the jurors."

Mr. Hindin then asked Gilliam, "Officer, why do you feel that the accident occurred?" After a defense objection was sustained, the court told Mr. Hindin that "His guess is not better than the jurors. . . . That is the jurors' duty . . . ." Mr. Hindin then asked the officer: "Let me ask you, is it your duty to form an opinion—" The court interrupted: "I tell you what his duty is here, and is not to go to the ultimate fact. That is the jurors' function, and let's not keep asking the same questions, because I am going to tell you again, no. He wasn't there. He took statements."

Mr. Hindin proceeded to ask Officer Gilliam about his experience in investigating and determining the cause of accidents. Defense counsel objected as irrelevant. The court stated to Mr. Hindin, "I don't know how many ways I can tell you no, no. It is clear that the vehicles met. To go beyond that, you are going into the jurors' function as to what caused it, who was at fault. That's their job, not the officer's." The court then told Mr. Hindin that the court had ruled and that he should go on to another matter, which Mr. Hindin did.

### 3. *Defense Expert Ray Hughes*

Later that same day, defendant called her expert engineer Ray Hughes. On cross-examination by Mr. Hindin, Mr. Hughes indicated that he was provided with a copy of Gilliam's police report and had read the report. Mr. Hindin then asked if Mr. Hughes had rejected Gilliam's opinions therein. Defense counsel asked to approach the side bar. The court stated, "Objection is sustained. Now, you are coming in side doors, back doors, Mr. Hindin. Now, please, you are not going to get that policeman's testimony in as to what he thinks the fault was."

Out of the presence of the jury, defense counsel made a motion for a mistrial, based on Mr. Hindin's alleged conduct attempting to make the jury believe there is something in the police report that is prejudicial to the defendant. The court denied the motion for mistrial, but adamantly refused to allow Mr. Hindin to introduce into evidence the officer's opinion of fault. Defense counsel asked the court if the jury could be instructed on the conduct of plaintiff's counsel. The court stated, "No, no, no."

After impliedly concluding that no attorney misconduct had occurred, the court did instruct the jury on the inadmissibility of Officer Gilliam's opinion. After the jury returned, the court told them, "Ladies and gentlemen, you have heard me talk a lot about not allowing the opinion of the officer in as to whose fault it was. [¶] I tell you again, there is evidence on both sides submitted by both parties from which you people as the ultimate triers of fact have to determine fault. *You don't need an expert to tell you that.* That's up to you, and you alone, not me, not the witnesses, not the lawyers. [¶] *You are the fact finders.* [¶] Now, there is evidence, both sides have put on evidence from which you can draw conclusions. *The opinion of the officer as to whose fault it was, has no bearing at all here. You are the trier. He is not the trier.* [¶] All right, you may continue." (Italics added.)

Thereafter, Mr. Hindin did not question Mr. Hughes or other witnesses as to the opinion of the police officer.

 Appellant contends that Mr. Hindin's repeated asking of the questions was a deliberate attempt to suggest to the jury a matter of an evidentiary nature after the court had ruled that the officer's opinion was not admissible, and such conduct was prejudicial because the content of the opinion was clearly suggested to the jury and defense counsel did not have an opportunity to cross-examine the officer on that subject. She also claims that the admonition was insufficient to cure the alleged prejudice and, because of the conflicting evidence at trial, such alleged misconduct caused the jury to bring in a large verdict and a finding that the plaintiff was not at fault.

"As the [California] Supreme Court noted nearly eighty years ago, '[i]t rarely occurs in any case which is of moment and sharply contested that counsel on both sides in their zeal and partisan devotion to their clients do not indulge in arguments, remarks, insinuations, or suggestions which find neither support in, nor are referable or applicable to the testimony, or warranted by any fair theory upon which the case is being presented. If such impropriety of counsel always afforded ground for a new trial, there would be little prospect of any litigation becoming finally determined. It is only when the conduct of counsel consists of a willful or persistent effort to place before a jury clearly incompetent evidence, or the statements or remarks of counsel are of such a character as to manifest a design on his part to awake the resentment of the jury, to excite their prejudices or passions against the opposite party, or to enlist their sympathies in favor of his client or against the cause of his adversary, *and the instructions of the court to the jury to disregard such offered evidence or objectionable remarks of counsel could not serve to remove the effect or cure the evil, that prejudicial error is committed.* It is only in extreme cases that the court, when acting promptly

and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' (*Tingley* v. *Times Mirror* (1907) 151 Cal. 1, 23 . . . .)" (*Menasco* v. *Snyder* (1984) 157 Cal.App.3d 729, 732 [203 Cal.Rptr. 748], italics added.)

In assessing that prejudice, each case ultimately must rest upon this court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances. (*Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 351 [133 Cal.Rptr. 42].)

■ To the extent that appellant also claims that the trial court erred in failing to grant her a new trial on the ground of misconduct of counsel, we apply the standard of review set out in *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860 [135 Cal.Rptr. 647, 558 P.2d 545]: "In our review of such order *denying* a new trial, as distinguished from an order *granting* a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the [attorney misconduct] was prejudicial." (*Id.,* at p. 872, original italics.)[2] This standard of review is consistent with that implied by the foregoing language in *Simmons* v. *Southern Pac. Transportation Co., supra,* 62 Cal.App.3d 341, 351.

■ Before we discuss the results of our examination of the record before us, we consider respondent's claim that appellant has waived her right to a review of most of the instances of alleged misconduct because she failed to assign the conduct as misconduct and request an admonition. A claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. (*Menasco* v. *Snyder, supra,* 157 Cal.App.3d 729, 733.) Because the

---

[2] In another case in which the issue of attorney misconduct was raised on appeal and had been presented to the trial court on a motion for new trial, which was denied, the California Supreme Court stated: "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong." (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667].) Rather than interpret this language as suggesting a more deferential abuse of discretion standard applies to the review of a claim of attorney misconduct when there has been the denial of a motion for a new trial, we interpret *Cope* as setting out one factor to consider in our independent review of the entire record under the more recent *Decker* decision. As a matter of policy, a litigant should be encouraged to raise the issue of attorney misconduct before the trial court on motion for new trial and should not receive a different standard of review on appeal for having done so.

effect of misconduct can ordinarily be removed by an instruction to the jury to disregard it, it is generally essential, in order that an act of misconduct be subject to review on appeal, that it be called to the attention of the trial court at the time, to give the court an opportunity to so act, if possible, as to correct the error and avoid a mistrial. (*Ibid.*) In the instant case, while defense counsel did object to all questions in which Mr. Hindin attempted to elicit Officer Gilliam's opinion of fault, he only requested an admonition after the last instance of the alleged misconduct.

Under the facts of the instant case, in which appellant claims that the cumulative effect of repeated instances of alleged misconduct was prejudicial, we deem defendant to have properly preserved the claim for appeal. However, in our examination of the instant record we consider the fact that defense counsel did not request an earlier admonition, as a significant indication that defense counsel himself did not consider such earlier conduct to be misconduct or such a "major theme of the trial," as appellant now characterizes the questions pertaining to Officer Gilliam's opinion.

 Upon our review of the instant record, bearing in mind the trial was an adversary proceeding, we conclude that while Mr. Hindin may have been aggressive and persistent, approaching close to the line between proper and improper conduct, he did not overstep that line and did not violate the duty "to respectfully yield to the rulings of the court, *whether right or wrong* . . . ." (*Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 126 [116 Cal.Rptr. 713], original italics.)

As to the first instance of claimed misconduct, where Mr. Hindin asked Officer Gilliam in plaintiff's case-in-chief if he had formed an opinion as to whether the defendant had made an unsafe left turn, the court had not before that time made a definite ruling as to the admissibility of such opinion testimony. The court stated, "It will depend on how the evidence goes." When Mr. Hindin did ask Officer Gilliam the above question, the court sustained defendant's objection and offered three reasons—insufficient expertise of the officer, the question was an incomplete hypothetical and the prejudice outweighed the opinion's probative value. Although two of those reasons did not foreclose Mr. Hindin from attempting to qualify Gilliam as an expert and from reframing another question on the subject, Mr. Hindin did refrain from doing so and quickly concluded his examination of Gilliam.

The next instances of claimed misconduct occurred many days later and after many other witnesses had testified, most of the intervening seven days of testimony being devoted to the issue of the plaintiff's injuries. The defense began its case with the testimony of plaintiff, Ms. Young, Mr. Raven

(through his deposition testimony), the defendant, and then Officer Gilliam. Mr. Hindin began his cross-examination of the officer with a question seeking his opinion as to whether the motorcycle was a hazard to defendant's vehicle. After defense counsel's objection, the court pointed out that Mr. Hindin did not ask the officer what witnesses to the accident had told him. Mr. Hindin reframed a question to the officer to elicit whether he formed an opinion based on what the witnesses told him. After an objection was sustained to that question, Mr. Hindin then asked two more questions pertaining to whether it was Gilliam's duty as a police officer to reach an opinion on fault. After the court precluded inquiry as to the nature of the officer's duties in this regard, Mr. Hindin questioned him concerning his experience in investigating and determining the cause of accidents, apparently in an attempt to qualify the officer as an expert. The court again sustained a relevancy objection to this line of questioning and told Mr. Hindin to go on to another matter. Mr. Hindin did so. Thus, it is apparent from the record that Mr. Hindin was attempting to find other theories of admissibility of the officer's opinion, which theories had not been expressly raised before. While Mr. Hindin clearly was testing the scope of the court's prior rulings, such repeated questioning did not constitute, as urged by appellant, a disrespectful defiance of the court's rulings.

Similarly, the fact that Mr. Hindin was unsuccessful in his attempt to elicit the officer's opinion through defense expert Mr. Hughes does not necessarily indicate he acted in defiance of the court's prior rulings. As Mr. Hindin explained to the court out of the presence of the jury, he was proceeding on the theory that it was within the proper scope of cross-examination of an expert to determine what information was provided to the expert and what information he relied upon in forming his opinion. In this case, Mr. Hughes had been provided with the police report and had read it.

Without addressing the issue of the correctness of the trial court's evidentiary rulings, which are not before us on this appeal, we conclude that Mr. Hindin's attempts to find other theories of relevancy or admissibility of Officer Gilliam's opinion did not overstep "the permissible line of proper lawyering conduct." (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 407 [196 Cal.Rptr. 117].) The trial court itself did not consider Mr. Hindin to have committed acts of misconduct because he refused defense counsel's request for an instruction on the conduct of plaintiff's attorney.

Even were the acts such as to constitute misconduct, we cannot find them to be prejudicial. This was a lengthy trial, aggressively litigated on both sides, with many witnesses and with frequent objections being made on both sides. The trial judge exercised a firm and fair control over the proceedings. Contrary to appellant's claim, the issue of Officer Gilliam's opinion was not

a major theme of the trial. Moreover, before the final "admonition" to the jury, the court, in sustaining defense objections to Mr. Hindin's questions, had explained his rulings to Mr. Hindin, which explanations also further informed the jury as to its function as the trier of fact. Given the firm control of the proceedings by the trial court, which maintained an impartial and dignified atmosphere at trial, we also conclude that the admonitions given to the jury were sufficient to remove any impropriety and prejudice which could have resulted from Mr. Hindin's conduct. Because we conclude that the admonitions were sufficient, we find without merit appellant's claim that prejudice resulted from her inability to cross-examine Officer Gilliam on the subject of his opinion.

■ Nor do we consider the verdict as to damages or the jury's allocation of all of the fault to appellant as an indication that the jury disregarded the admonition or was influenced by Mr. Hindin's conduct. No argument is made that the verdict is excessive in amount, given respondent's injuries. Moreover, the jury was entitled to disbelieve the primary defense witnesses, Ms. Young and Mr. Raven, who essentially testified that respondent was speeding at the time of the accident. The testimony of Ms. Young was so confusing and inconsistent that she essentially impeached herself, and the jury's apparent rejection of her testimony would be unaffected by Mr. Hindin's conduct. Even the testimony of the defense expert engineer, who determined the speed of the motorcycle at impact to be about 33 to 38 miles per hour, does not necessarily establish that respondent was exceeding the posted speed limit. The evidence in this case is not so delicately balanced that Mr. Hindin's conduct would have disturbed the jury's due deliberations and assessment of credibility.

The instant case is thus easily distinguishable from *Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183], relied upon by appellant. In that case against a drug company and a doctor for damages caused by a prescription drug, the court found over 60 instances of "flagrant misconduct" by plaintiff's attorney from the beginning to the end of a trial which lasted about 3 weeks. The misconduct there consisted of remarks in opening statement that people were dying all over the country from the drug, that the defendant had no regard for the safety of people using the drug, there was not a bigger "con outfit" in the world than defendant; that defendant was a gangster and the doctor its gunman, and an unfounded insinuation that defendant had bribed the Food and Drug Administration. Counsel also brought before the jury matters never received in evidence and engaged in "vilification and abuse" of opposing counsel. The court characterized the misconduct of plaintiff's trial counsel as "egregious beyond any in our experience or that related in any reported case brought to our attention

. . . ." (*Id.,* at p. 382.) Mr. Hindin's conduct is a far cry from that in *Love v. Wolf.*

We conclude that Mr. Hindin was not guilty of misconduct. Even were we to characterize his acts as misconduct, they clearly were not prejudicial. ■ To the extent that appellant seeks review of the order denying her motion for new trial on the ground of attorney misconduct, which order is not directly appealable but may be reviewed on appeal from the judgment (*Price* v. *Giles* (1987) 196 Cal.App.3d 1469, 1472 [242 Cal.Rptr. 559]), we conclude that the trial court also properly denied the motion for new trial on the ground of attorney misconduct.

## II

### DENIAL OF MOTION FOR NEW TRIAL

■ Appellant claims that the trial court misconceived its duty and erroneously denied her motion for new trial on the ground of insufficiency of the evidence because it felt bound by the jury's verdict even though "the trial court independently weighed the evidence and concluded the jury clearly should have reached a different result . . . ."

■ "When a trial court rules upon a motion for a new trial made upon the ground of insufficiency of the evidence, the judge is required to weigh the evidence and judge the credibility of witnesses." (*Locksley* v. *Ungureanu* (1986) 178 Cal.App.3d 457, 463 [223 Cal.Rptr. 737].) "While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict." (*People* v. *Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14].) Insufficiency of the evidence in this context means an absence of evidence or that the evidence received, in the individual judgment of the trial judge, is lacking in probative force to establish the proposition of fact to which it is addressed. (*People* v. *Capps* (1984) 159 Cal.App.3d 546, 552, fn. 5 [205 Cal.Rptr. 898].)

The court does not disregard the verdict, or decide what result it should have reached if the case had been tried without a jury, but instead "it should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." (*People* v. *Robarge, supra,* 41 Cal.2d at p. 633.)

Some courts state the rule to be that "a new trial cannot be granted '. . . unless after weighing the evidence the court is convinced from the entire

record, including reasonable inferences therefrom, *that the court or jury clearly should have reached a different verdict or decision.*' " (*Locksley* v. *Ungureanu, supra,* 178 Cal.App.3d at p. 463, original italics.) Appellant interprets language similar to the foregoing in *Lippold* v. *Hart* (1969) 274 Cal.App.2d 24, 25-26 [78 Cal.Rptr. 833], as suggesting essentially that the trial court must grant a new trial whenever it disagrees with the verdict. Because the language of the court in *Lippold* stating the rule appears to be incomplete and may be misleading, we prefer the better reasoned and more complete explanation of the trial court's function by the court in *People* v. *Robarge, supra,* 41 Cal.2d 628, 633.

■ Applying the proper standard, it is clear that the trial court here correctly performed its duty. The following colloquy occurred at the hearing on the motion for new trial: "The Court: I will tell you frankly, if the court were hearing the case, I would have found at least substantial comparative negligence, but I have looked over the case. The jury did not come in with the verdict I would have come in with, but when I look at it and the matter of credibility of the witnesses, witnesses that I would have disbelieved, they believed. And witnesses I would have believed, they would have disbelieved. . . . [¶] Mr. Rhames [Defense counsel]: Well, your Honor, there is the law which requires the court to make an independent determination and weigh the facts . . . . [¶] The Court: I have, but when you talk about the one witness you had who—sure, albeit, [was] dyslexic, the jury could very well have disregarded her, with the other witness's testimony by deposition [Mr. Raven]. [¶] Deposition testimony is as good as other testimony, but with that in juxtaposition [with] the people in the . . . van, I wouldn't give her—it nearly as much credence. But still, it is strictly a matter of weighing the evidence, and reasonable people can differ, and I cannot upset the verdict."

The experienced and able trial judge in the instant case impliedly found that there was sufficient credible evidence to support the verdict, and that the jury was reasonable in believing the witnesses it apparently had believed in reaching its verdict. The court recognized that it could not grant the motion for new trial simply because it would have found differently than the jury. Thus, we find without merit appellant's contention that the trial court erred in denying the motion for new trial.

III

FRIVOLOUS APPEAL

Respondent, contending that the appeal is frivolous and prosecuted solely for delay, requests $250,000 in sanctions against defendant, her attorneys,

and her insurance carrier. In reply, appellant claims that such a request is groundless and suggests that it is respondent's request which is frivolous and that respondent should be sanctioned. Under the standards set out in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 648-651 [183 Cal.Rptr. 508, 646 P.2d 179], we do not deem this to be a proper case for the imposition of sanctions against either party.

## DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods (Fred), J., concurred.