Filed 2/5/21  McNair v. National Collegiate Athletic Assn. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TODD McNAIR, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, <br><br> Defendant and Appellant. | B295359 <br><br> (Los Angeles County Super. Ct. No. BC462891) |

APPEAL from an order of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Affirmed.

Munger Tolles & Olson, Donald B. Verrilli, Jr., Glenn D. Pomerantz, Nicholas S. Dufau; Wilkinson Walsh + Eskovitz, Kosta S. Stojilkovic, Rakesh Kilaru and Julie B. Rubenstein for Defendant and Appellant.

Greene Broillet & Wheeler, Bruce A. Broillet, Scott H. Carr, Christian T. F. Nickerson; Esner, Chang & Boyer, Stuart B. Esner and Kevin K. Nguyen for Plaintiff and Respondent.

This is the fourth proceeding before this court in the defamation action brought by plaintiff Todd McNair against the National Collegiate Athletic Association (the NCAA).[1]  The lawsuit arose from the NCAA's finding that McNair, a former assistant coach for the University of Southern California (USC) football team, violated ethical conduct regulations during the NCAA's investigation into whether team member Reggie Bush received improper benefits while he was a student-athlete at USC.  In this appeal, the NCAA challenges the trial court's declaratory judgment and its order granting McNair's motion for new trial.  We hold that the trial court did not abuse its discretion in finding insufficient evidence to justify the verdict on falsity.  Accordingly, we affirm the new trial order and do not address the NCAA's challenge to the declaratory judgment.

## BACKGROUND

I.    The NCAA

"The NCAA is a private, voluntary organization composed of approximately 1,200 colleges, universities, and other educational institutions throughout the United States.  Its purpose is ' "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and by so doing, retain a clear line of demarcation between college athletics and professional sports." ' " (*McNair I, supra,* 234 Cal.App.4th at p. 29.)

---

[1] *McNair v. National Collegiate Athletic Assn.* (2015) 234 Cal.App.4th 25 (*McNair I*); *McNair v. National Collegiate Athletic Association* (Dec. 7, 2015, B245475) [nonpub. opn.] (*McNair II*); *McNair v. Superior Court* (2016) 6 Cal.App.5th 1227.

The NCAA accomplishes this purpose by adopting and enforcing a constitution, bylaws, and regulations. (*McNair I, supra*, 234 Cal.App.4th at p. 29.) Under the enforcement process, when the NCAA receives an allegation of a rule violation, investigators attempt to interview everyone who may have knowledge of the alleged violation. (*McNair II, supra*, B245475.) If the enforcement staff concludes there is sufficient information to indicate that NCAA rules have been violated, it provides the institution with a notice of allegations. At the conclusion of its investigation, the enforcement staff submits a case summary to its Committee on Infractions (the COI). (*Ibid.*) The COI is comprised of athletic directors, athletic conference commissioners, faculty athletic representatives, judges, attorneys, and professors, who serve voluntarily and not as employees of the NCAA. (*Ibid.*) After holding a hearing, the voting members of the COI deliberate in private. (*Ibid.*) The COI's findings are made, and the penalties are imposed, in an infractions report. The NCAA Infractions Appeals Committee hears any appeal of the COI's determinations. (*Ibid.*) The NCAA's bylaws require that COI and Appeals Committee reports " 'be made available to the national wire services and other media outlets.' " (*Ibid.*)

Member institutions, along with their employees, student athletes, and alumni agree to comply with the rules and regulations and to submit to the NCAA's enforcement process. Because the NCAA does not have subpoena power, the enforcement staff relies on the cooperation of witnesses. (*McNair I, supra*, 234 Cal.App.4th at p. 29.) Under this so-called cooperative principle, member institutions agree to be transparent and cooperative, and that the process will be fair.

The NCAA is empowered to penalize a coach and an institution when, among other things, a coach knows of an infraction and fails to report it, or knowingly furnishes false or misleading information about involvement in, or knowledge of, a rules violation.

II.    The allegations

In 2006, during Bush's third year of college, the NCAA received allegations that he had violated NCAA rules while he was a running back on the football team.  According to the allegations, Lloyd Lake (Lake), a convicted felon, and his associate Michael Michaels (Michaels) formed a sports agency and marketing company and began giving Bush and his parents cash and other benefits such as merchandise, housing, lodging, and transportation in exchange for Bush's promise to sign with Lake's agency when he began playing professional football. Although this arrangement rendered Bush ineligible to participate in college football, he continued to play for USC.

Based on these allegations and others involving the men's basketball and women's tennis programs at USC, the NCAA commenced a sweeping, four-year investigation into possible violations of NCAA legislation in USC's intercollegiate athletics program.

III.    The operative statement

At the close of the enforcement process, the COI issued its 67-page infractions report containing numerous findings and imposing significant sanctions against USC's football program.

Five pages of the COI report concerned McNair, the running backs' coach.  Specifically, the NCAA's COI found in the operative statement at issue here:

4

"At least by January 8, 2006, the assistant football coach [McNair] had knowledge that [Bush] and [Lake and Michaels] likely were engaged in NCAA violations. At 1:34 a.m. he had a telephone conversation for two minutes and 23 seconds with [Lake] during which [Lake] attempted to get [McNair] to convince [Bush] either to adhere to the agency agreement or reimburse [Lake and Michaels] for money provided to [Bush] and his family. Further, during his September 19, 2006, and February 15, 2008, interviews with the enforcement staff, [McNair] violated NCAA ethical conduct legislation by providing false and misleading information regarding his knowledge of this telephone call and the NCAA violations associated with it. [McNair] failed to alert the institution's compliance staff of this information and later attested falsely, through his signature on a certifying statement, that he had no knowledge of NCAA violations."

Under the heading "Committee Rationale," the COI report's ensuing three and a half pages about McNair acknowledged that the enforcement staff, USC, and McNair disagreed about the facts underlying the COI's finding against McNair. (Boldface and underscore omitted.)

As support for its finding that McNair violated the NCAA's ethical conduct legislation, the COI report relied exclusively on the January 8, 2006 telephone call at 1:34 a.m. between McNair and Lake (the late-night call). The operative statement continued with:

"The [COI] nonetheless remains particularly troubled by the two minute and 32 second telephone call from [Lake] to [McNair] that took place at 1:34 a.m. on January 8, 2006. [McNair] claimed that he did not remember the phone call and denied [Lake's] description of what was said. The committee

5

finds [Lake] credible in his report of the call. [Lake] said that he phoned [McNair] to ask him to intercede with [Bush] and get him to adhere to the agency agreement that he made with [Lake and Michaels]. [Lake] said he also told [McNair] that he did not intend to lose the money he had given [Bush] and his parents and preferred not to go public with the matter and implicate [USC]."

The NCAA confirmed at trial that the late-night call was the "linchpin" of the COI's operative statement that McNair knew of the benefits Lake's agency gave Bush and lied about his knowledge to USC and the NCAA.

The COI report listed facts to justify the COI's doubt about McNair's credibility. Those facts were: (1) that McNair and Lake were both friends with Faizon Love, a comedian and actor, who grew up with Lake; (2) a photograph of McNair, Love, Lake, and Michaels (the photograph), which was taken on Michaels' telephone and which the NCAA did not believe McNair would have agreed to without having at least been introduced to Lake; (3) three one-minute telephone calls McNair made to Lake on March 29, 2005, despite denying he ever knew or spoke to Lake, and (4) the late-night call that served as the exclusive basis for the finding against McNair. The COI found it implausible that McNair would have stayed on the late-night call for two minutes and 34 seconds with someone he claimed not to know.[2]

_____

[2] The NCAA also discussed a party in San Diego in 2005 for Marshall Faulk, a running back in the National Football League, which both McNair and Lake attended. However, the COI could not make an unethical conduct finding against McNair based on the information he provided about the San Diego event because of unresolved discrepancies in witness reports. Before trial, the parties agreed that they would put on very little evidence about this San Diego event, for impeachment purposes only.

6

After discussing this evidence causing the NCAA to doubt McNair's credibility, the COI found that the late-night call occurred "*as described by*" Lake (italics added), and therefore that McNair violated NCAA ethical conduct legislation by providing false and misleading information to the enforcement staff about the call and about his knowledge of Lake's activity. McNair unsuccessfully appealed the findings to the Infractions Appeals Committee.

As a result of the COI's findings, the NCAA prohibited McNair from engaging in recruiting activities or contacting prospective student athletes for one recruiting season, from April 29, 2011 to April 28, 2012. The NCAA did not prohibit McNair from coaching. However, USC did not renew McNair's contract. McNair had difficulty finding another college or professional coaching job and was initially reduced to coaching at a local high school.

IV.    McNair's lawsuit

McNair sued the NCAA. The complaint alleged that the NCAA's false and malicious statements that McNair was unethical and had committed unethical acts damaged his reputation and ruined his career as a college football coach by making him toxic to his then employer and to any potential future college employers.

As noted, this lawsuit has already come before this court three times, resulting in two published opinions.[3] By trial, only two of the seven causes of action alleged in the complaint remained, one for defamation to be tried by a jury, and one for declaratory relief to be tried by the court.

---

[3] See footnote 1, *ante,* at page 2.

7

V.     The evidence adduced at trial of the late-night call

     *A. Lake's interview*

     The NCAA enforcement staff did not interview Lake early in the investigation because Lake had been jailed for violating terms of his probation for an earlier felony conviction. After 18 months of negotiations, Lake agreed to one interview with the enforcement staff. Lake did not testify at trial. Instead, the jury heard a recording and received a transcript of Lake's interview, conducted in November 2007 by NCAA Enforcement Staff employee Richard Johanningmeier and staff member Angie Cretors.

     Asked whether McNair had any reason to believe that Bush was involved with him and Michaels, Lake, who was not under oath, responded, "Oh, he knew he was, . . . [¶] . . . [j]ust because, you know, the whole situation, sports company, Reggie buying the car, the room, there's too any coincidences." Lake told the NCAA interviewers, "I know I told [McNair] because I wanted him to know that Reggie was involved and try to let him in on some action." Lake also told the enforcement staff that he called McNair a couple of times, including once in January 2006 to get his money back. The telephone records show only one call from Lake to McNair, the late-night call. Later, Lake could not recollect telling McNair that Bush had ownership of the agency.

     Focusing particularly on the late-night call that formed the basis of the operative statement that McNair "had knowledge" of the improper benefits and the agency relationship, the following was said in Lake's interview:

     "RJ [Johanningmeier]: Well let me ask you this one, too, Lloyd, on, uh, January 8th, 2006, at 1:34 [a.m.], there's a call, *McNair call to you* for two minutes and 32 seconds.

8

"LL [Lake]:  What time was that?

"RJ:  This is January 8th, 2006, it's at 1:34 [a.m.], and it's a call, uh, McNair --

"AC [Cretors]:  Coach doesn't understand why people are calling at 1:34.

"RJ:  -- *McNair makes a call to you* at 2:32 [*sic*].  I was asleep at that time --

"LL:  Yeah.

"RJ:  -- personally, but, but in your case --

"LL:  *I think that was like, that was like him trying to resolve it*, you know, and like [Bush is] wrong, he should make it right and basically don't implement [*sic*] the school.

"RJ:  Because this, this is 2006 we're talking about.

"LL:  Yeah, that's when I went to jail, that's when everything started falling apart, I mean, it fell apart.

"RJ:  *What can you* tell us that you *specifically recall about that conversation with him*?

"LL:  *Uh, just telling about* [*Bush*] *and all, he knew about the money he took, he knew that he had an agreement and* --

"AC:  . . . McNair *indicated to you in the telephone conversation that he was aware that* [*Bush*] *took money* --

"LL:  *I mean, he knew* --

"AC:  -- *from you*?

"LL:  -- yeah bec [*sic*], *he knew Reggie took money from me. There's no doubt he knew about that*.

"RJ:  And *why do you say that*?

"AC:  Yeah, we need to know why you, why you believe that [McNair] knew that?

"LL:  '*Cause he was around a lot* and, you know, it's *like he watched me get them guys, his friends, hotel rooms*, [*Bush*] *told*

9

*me he knew* about certain things he was doing but he's cool. You know what I mean? *It's like basically through* [*Bush*] --

"AC: [*Bush*] said he --

"LL: -- 'cause I told [*Bush*] you shouldn't be having the, no, he's cool, the coach, that's my, he's my friend. He's not -- "
(Italics added.)

The enforcement staff had the telephone records of both McNair and Lake, which showed that the late-night call was initiated *by Lake, not by McNair*. Cretors testified that Lake adopted the mistake and gave a motivation to McNair for calling him when McNair did not make the telephone call. Cretors testified she was initially skeptical of Lake because of his criminal history. She explained that Lake was not covered by the cooperative principle and was under no obligation to talk to the NCAA. The enforcement staff did not interview Michaels. The record contains no testimony from Bush.

### B. *McNair's interview*

The NCAA enforcement staff interviewed McNair in September 2006 while he was an assistant football coach at USC. McNair did not retain an attorney because he did not think he needed one. He told the enforcement staff that he had next to no contact with Bush outside of practices and games, and he did not recall meeting or speaking to Michaels. Asked whether he had ever met Lake, McNair responded, " 'Not to my knowledge.' " McNair stated, "I don't ever recall talking to Lloyd Lake in my life."

A second interview of McNair by the enforcement staff occurred three months after Lake's interview, in February 2008. As he was not told he was under investigation, McNair did not retain counsel. Johanningmeier asked McNair whether he

10

remembered the two minute and 32 second telephone call at 1:32 a.m. with Lake on January 8, *2005*. McNair stated he did not remember that call, which had occurred in *2006*. Trying to recollect it, McNair explained that in January 2005, after the Orange Bowl Championship, he could have been on the road recruiting. Realizing that they had gotten the year of the late-night call wrong, the enforcement staff considered reinterviewing McNair using the date of 2006 instead of 2005, and giving McNair the context of the call so he might better remember. However, the enforcement staff decided not to interview McNair again. The NCAA did not base its unethical conduct finding on this interview.

### C. *The COI hearing*

At the close of its hearing, held over three days in 2010, the COI began deliberations and made various findings concerning USC, but was unable to reach a determination about McNair.

To make a finding against an institution such as USC, the NCAA had to find either a loss of institutional control or that an employee knew about a rules violation and failed to report it. Some voting members of the COI expressed difficulty with the interviews of McNair and Lake. One called the Lake interview "choppy;" one said the McNair interview was "botched" because the dates were wrong; another said the record was "recklessly constructed", and one said the investigation had "fallen short." One member observed that Lake even had difficulty recalling McNair's name until the enforcement staff prompted him. Some members noted that the question was whether McNair *actually knew* about Lake's agency and the benefits Lake gave Bush, which would make lies out of McNair's denials to the investigators. One member found no evidence that McNair was

11

personally involved or had specific knowledge of any wrongdoing. Nonetheless, the COI ultimately agreed to the operative statement as written.

### D. McNair's trial testimony

At trial, McNair testified about the evidence the COI report cited as showing his lack of credibility, namely, the photograph, the three calls, and the late-night call.

As for the photograph, McNair testified that throngs of people would come to downtown Los Angeles after a Saturday USC football game and wanted to see celebrities. McNair would bring along his friend Faizon Love. McNair has posed for so many pictures that he could not remember the photograph in particular.

Telephone records showed McNair made three one-minute calls to Lake over a 17-minute period on October 29, 2005. McNair testified that Bush was hosting the number-one high-school recruit in the country, but Bush's cellphone was running out of battery and so he gave McNair a different number to use to reach him. Telephone records revealed that the number belonged to Lake. McNair learned that Bush had left the recruit alone in a downtown Los Angeles hotel room. In an effort to locate Bush, McNair made three quick calls to the number Bush gave him and assumed at trial that he reached Bush on the third try. McNair recalled the events of October 29, 2005 because the recruit did not sign with USC after being left alone that night.

The late-night call was the only one Lake made to McNair. McNair testified that to the best of his knowledge, he had never met Lake. As late as trial, McNair could not remember what the late-night call was about. McNair explained that he would have remembered the call had Lake related his agency relationship

12

with Bush.  In McNair's words, USC had "the most-high profile team in the country" back then and "everything we did was . . . news."  Had Lake told McNair about the improper benefits, "that would have been a profound phone call"; it "would have threatened everything we had worked for," and so he would have remembered it.

McNair did not learn about the agency relationship or the improper benefits Bush received from Lake during the night of the three calls or during the late-night call.  McNair testified he first learned when it was announced on the news.

## VI.    The jury finds in favor of the NCAA

The jury heard the testimony of members and employees of the NCAA and McNair, among others.  The jury also had, inter alia, the photograph, the telephone records, the COI report, and the transcript of the Lake interview.

Initially, the jury was deadlocked at a vote of eight to four.  The trial court then learned that one of the jurors had a language issue that made it difficult to fully participate in the deliberations.  That juror was removed by the court and replaced with an alternate.  Soon thereafter, the jury returned a nine-to-three defense verdict finding that the NCAA's statements about McNair were not false.

## VII.    The declaratory relief judgment

In his seventh cause of action, McNair sought a declaration that the NCAA's rules and regulations, as written and as applied to McNair, were arbitrary, capricious and in violation of all notions of fairness and good faith, and asked that they be stricken.  After the jury verdict, the trial court entered a declaratory judgment in favor of McNair.  The court found that

13

the "Show-Cause Order" provisions in the NCAA bylaws under which McNair was penalized, and which were a substantial factor in his suffering continuing harm, "are void in California as they constitute an unlawful restraint on engaging in a lawful profession pursuant to Cal. Business and Professions Code section 16600." (Boldface omitted.)

VIII.  The new trial motion

McNair moved for a new trial of the defamation cause of action on the grounds of the insufficiency of the evidence to justify the verdict (Code Civ. Proc., § 657, subd. (6)),[4] the disqualification of a juror on the basis of an irregularity in the proceeding (§ 657, subd. (1)), jury misconduct (§ 657, subd. (2)), and error in law (§ 657, subd. (7)).  The trial court granted McNair's motion for new trial on all proffered grounds and ordered a new trial.  The NCAA timely appealed from both the declaratory judgment and the new trial order.

## DISCUSSION

I.    The new trial order.

The NCAA contends that the new trial order was error.  We discern no abuse of discretion in the order granting the new trial motion on the ground of insufficiency of the evidence to justify the jury verdict.  (§ 657, subd. (6).)

A.  *Standard of review*

" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion

---

[4] All further statutory references are to the Code of Civil Procedure.

14

clearly appears.  This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter.' " (*Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, 1275.)  As established by the Supreme Court in *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 (*Lane*), an order granting a new trial motion under section 657 for insufficiency of the evidence to justify the verdict " 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.]  Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.]  In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' "

"The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons." (*Lane*, *supra*, 22 Cal.4th at p. 412.)

The NCAA contends that we should not apply the deferential standard of review delineated in *Lane*.  It quotes from section 657 which prohibits a new trial on the ground of insufficiency of the evidence to justify the verdict "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury *clearly* should have reached a different verdict or decision." (Italics added.)  Citing *County of Riverside v. Loma Linda University* (1981) 118 Cal.App.3d 300, the NCAA argues that the statement of decision here did not utilize the word

15

*clearly* in ruling that "the jury should have answered question 3 'YES,' " with the result that rather than deferring to the trial court's ruling, we must independently examine the evidence on which the jury relied.  The contention is unavailing.

In *County of Riverside v. Loma Linda University*, *supra*, 118 Cal.App.3d 300, the trial court told the jury at the conclusion of trial that it disagreed with the jury's finding on the existence of a joint venture but denied a new trial motion brought on that ground.  (*Id*. at p. 322.)  In affirming the denial of a new trial, the appellate court stated simply, "the judge did not say that he thought the jury 'clearly' should have reached a different verdict.  The fact that he said he would have ruled differently had he been deciding the case does not indicate an abuse of discretion."  (*Ibid*.)  While the failure to use the word clearly may have justified the denial of a new trial motion, the absence of the word clearly does not undermine the grant of a new trial when, as explained in *Lane*, *supra*, 22 Cal.4th at page 412, the trial court has stated its reasons for granting the new trial, and substantial evidence supports those reasons.

As the NCAA implicitly acknowledges by citing *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, the appellate court independently reviews the record *only* when the trial court fails to provide a statement of reasons; otherwise we apply the *Lane* standard.  (*Id*. at pp. 636, 640–641.)  In *Oakland Raiders*, the trial court's statement of decision did not specify any reasons for its decision to grant a new trial on the basis of juror misconduct.  (*Id*. at p. 632.)  The Supreme Court explained that the statement of reasons required by section 657 "should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation."  (*Id*. at

16

p. 634.) In the absence of a sufficiently specific statement of reasons, the applicable standard of review is independent judgment rather than abuse of discretion. (*Id*. at p. 640.)

Here the order for new trial contained a lengthy statement of reasons that is not vitiated by the omission of the word *clearly*. Spanning four and one-half, single-spaced pages, the statement of reasons properly discussed the evidence, the credibility of witnesses, the weight of the evidence, and the trial court's rationale for finding "several material ways" in which the COI report's operative statement was false. The court then used stronger language than the word clearly, ruling that it was "*convinced* from the *entire record, including reasonable inferences therefrom*, that the jury should have answered question 3 'YES.' " (Italics added.) Addition of the word clearly would have been redundant. The statement of reasons manifestly met the *Oakland Raiders* requirement and so we apply the abuse of discretion standard outlined in *Lane*.

Under the *Lane* standard of review, we " 'defer to the trial court's resolution of conflicts in the evidence if the decision is supported by substantial evidence and reverse only if there is no reasonable basis for the court's decision or the decision is based on a legal error. [Citations.] [¶] An order granting a new trial "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 336–337.) "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 763.) This means that the

17

"well-known rules" governing review of orders granting or denying a new trial motion "are designed to affirm the trial court's ruling." (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 581.) Affirmance is more likely when the trial court grants a new trial. (*Sandco American, Inc. v. Notrica* (1990) 216 Cal.App.3d 1495, 1506.) Under the operative standard of review, so " ' "long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." ' " (*Johnson & Johnson*, at p. 337.)

B. *The new trial order was not an abuse of trial court discretion.*

The jury found in special verdict question Nos. 1 and 2, that the NCAA made statements of fact to third persons who reasonably understood that the statements were about McNair. Thus, the basis for the defense verdict was the jury's nine to three *no* vote on question No. 3, "With respect to the statements for which you answered Yes in Question 2, were any of the statements false?"

The NCAA acknowledges that the late-night call was the "linchpin" on which it sanctioned McNair, and the only evidence of the *content* of the late-night call was the Lake interview. Comparing the operative statement to the transcript of Lake's interview, the court found that the operative statement's summary of the late-night call was "false in at least the following ways:" (1) it falsely stated who initiated the call; (2) it falsely related the purpose Lake ascribed to the call; and (3) it falsely stated that McNair and Lake discussed the agency agreement and improper benefits during the late-night call. Therefore, the court found the operative statement did not "paraphrase" the Lake interview, but was "a fictional account of the Lake version"

18

of the late-night call that was the impetus for the sanctions imposed on McNair.

The statement of reasons focused on the credibility, admissibility, and weight of the evidence. On the one hand the trial court found McNair "to be a credible witness." On the other hand, the court observed that Lake did not testify at trial, and that the transcript of Lake's interview was inadmissible, as it was not given under oath, it contained hearsay, and at times double hearsay, and it was only admitted to show the basis for the operative statement. The court called Lake's interview answers "unclear and unresponsive to the point of being unreliable," and "impossibly vague." Therefore, the court concluded that McNair's denial that he had knowledge of Lake's payoffs to Bush "was not credibly rebutted or impeached" and so the NCAA's evidence about what was said in the late-night phone call was insufficient to justify the verdict.

We discern no abuse of discretion. The NCAA acknowledges that the only support for the operative statement's finding that McNair "had knowledge" of NCAA violations was the late-night call, the so-called "linchpin." The only evidence adduced about what was said during the late-night call was the transcript of Lake's interview. Viewing the transcript along with the inferences the trial court drew according to the required rules (see *Lane*, *supra*, 22 Cal.4th at p. 412), the court reasonably found it did not support the operative statement.

The NCAA's brief focuses only on the first two of the trial court's reasons for finding falsity and on the court's observation that Lake's interview was sloppy. The NCAA argues the late-night call occurred and so whether Lake said he called McNair or vice versa, whether Lake wanted McNair to enforce an agency

19

agreement or tell Bush to return the improper benefits to Lake, and the fact that the court would have interviewed Lake differently, are "inconsequential points" and a "red herring" that do not undercut the jury's finding.[5]

However, the transcript of the Lake interview supports the trial court's findings. Contrary to the operative statement, it was Johanningmeier, not Lake, who said "McNair makes a call to you [Lake]." The significance of this incorrect assertion is that in response, Lake, who did not appear to remember the call, attributed a motive to McNair for calling—knowledge of the agency and benefits—when McNair had not made the call. Cretors acknowledged this at trial. As the court reasonably observed, "McNair could have had no purpose in making an unmade phone call." Indeed, Lake appeared to be guessing at the late-night call's topic, stating, "I think that was like, that was like him trying to resolve it."

Far from being inconsequential, these points—who made the late-night call, and the purpose of the call—constitute core elements of the statement of reasons because they are the

_____

[5] McNair argues that our opinion in *McNair II*, which rejected these same arguments, is law of the case to which we are bound. In that earlier appeal, we affirmed the denial of the NCAA's special motion to strike McNair's libel cause of action (§ 425.16) on the ground, in part, that McNair provided evidence demonstrating "prima facie that the operative statement could reasonably be interpreted as implying a provably false assertion of fact." (*McNair II*, *supra*, B245475.) Law of the case does not help McNair. That doctrine applies only to appellate courts' decisions on issues of law; it does not apply to questions of fact (*People v. Barragan* (2004) 32 Cal.4th 236, 246), such as whether McNair proved at trial that the operative statement was false.

evidence for the operative statement's assertion that McNair knew about the improper benefits and agency agreement. Lake gave an unresponsive and vague answer to the question whether McNair had indicated in the late-night call that he knew that Bush was taking money: "I mean, he knew." And, although Lake said that McNair "knew," he did not base this statement on anything that was said during the late-night call, but on assumption drawn from events that did not occur during the late-night call. When asked directly why he believed McNair knew, Lake responded that the reason was that McNair was "around a lot" and "watched [Lake] get them guys, his friends hotel rooms," "basically *through* Reggie." (Italics added.) In fact, Lake ended by giving a hearsay response: "Reggie told me he knew." From this transcript, the trial court reasonably inferred its third falsity finding: namely, that contrary to the operative statement, Lake did not state that he and McNair discussed the improper benefits and agency agreement during the late-night call.

More important, however, apart from the trial court's finding that the Lake interview failed to give substantive support for the operative statement's assertions, the weight the court ascribed to the evidence along with the trial court's evidentiary findings, are fatal to the NCAA's challenge to the new trial order. The court found McNair's denials that he knew of the improper benefits and agency agreement to be credible. In contrast it gave *no* evidentiary weight to Lake's interview. Finding Lake's answers to be unclear, unreliable, speculative, vague, and so unresponsive that they would have been stricken had they been made in court, the statement of reasons concluded that the interview—the only evidence of the contents of the late-night call—was "without evidentiary value to support" the operative

21

statement, and that "no reasonable trier of fact could have found that" the operative statement's assertions about McNair were true based on Lake's interview. We cannot reassess the weight the trial court accords the evidence (*Armstrong v. Svoboda* (1966) 240 Cal.App.2d 472, 473), and cannot say that the trial court's assessment of the evidence was unreasonable. And, the NCAA raises no challenge on appeal to the court's evidentiary rulings. Lake was unsworn, was not subject to the cooperative principle, gave hearsay responses (Bush "told me he knew"), and was frequently interrupted by the interviewers so that it is difficult to ascertain what question he was responding to. Cretors was initially skeptical of Lake because he was not subject to the cooperative principle. Without support from Lake's interview, the trial court reasonably found there was no "credible basis for the jury to have found" the statements "were other than false."

The result of the credibility assessment, along with the weight the court gave to, and the inferences it derived from, the evidence pursuant to section 657, is inescapable: McNair's credible denials render false the operative statement's assertions that he knew about the NCAA violations, and so McNair carried his burden at trial to prove falsity. (See CACI No. 1701; *Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1156.) The NCAA failed to rebut this evidence because it relied solely on Lake's vague, unresponsive, unreliable, and inadmissible interview responses, that in any event did not substantively support the operative statement.

The NCAA contends that the trial court failed to account for former CACI No. 1729, the substantial truth instruction given to the jury. That instruction " 'absolve[s] a defendant even if she cannot "justify every word of the alleged defamatory matter; it is

22

sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." ' " (*Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 860–861.) The NCAA points to elsewhere in the interview transcript—not mentioned in the statement of reasons—in which Lake said he called McNair a couple of times, and once in January 2006 to "get this resolved, just get my money back and make it right." Relying on *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 216, the NCAA insists that where some evidence in the record supports the verdict, the court was "not entitled" to reverse simply because it would have found contrary to the jury, that there was *no* evidence to justify the verdict.

The argument misapplies the standard of review. It has long been the law that the trial court ruling on a motion for new trial "sits . . . as an independent trier of fact" (*Neal v. Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 933), or " ' "as a thirteenth juror," ' asking whether ' "the weight of the evidence appears to be contrary to the jury's determination" '; in so doing, the court is *free to* ' "*disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact.*" ' " (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 900, italics added.) The trial court detailed its reasons for according Lake's interview—the only evidence of the content of the late-night call—*no* evidentiary weight. As the record supports that finding, the trial court reasonably concluded there was no evidence for the operative statement's assertion that McNair "had knowledge" of the NCAA violations and therefore no evidence to support the jury verdict.

The NCAA also argues that the statement of reasons focused on "minor details" that "offered no insight into the COI

23

report's *key* conclusion—that McNair had committed improper conduct by lying to NCAA investigators about *his relationship with Lake.*" (Italics added.) The NCAA lists the photograph and the three telephone calls on March 29, 2005 to show that Lake and McNair interacted, and argues that McNair's defamation claim "hinged on whether the jury believed that McNair had lied to NCAA investigators when he claimed that [he] *had never known or spoken to Lake.*" (Italics added.)

As an initial matter, McNair did not deny outright knowing Lake; he denied *recalling* ever speaking to or meeting the man. That testimony goes to McNair's credibility, which under the procedural posture here is a question for the thirteenth juror, and which in any case does not shed light on McNair's "knowledge of" the NCAA violations. Moreover, McNair's testimony, credited by the trial court, showed the superficiality of the above-referenced interactions with Lake. McNair made three one-minute calls to a number Bush gave him to locate Bush who had abandoned a recruit, and McNair could not remember the photograph in particular given so many photographs were taken after USC football games, especially of his friend and celebrity Love. Nor does the fact that Love grew up with Lake reveal what McNair knew.

More to the point, however, the question for the jury to resolve was *not* whether McNair lied about having a "relationship," known, spoken to, or interacted with, Lake. Rather, as some of the *COI members recognized, the issue was whether McNair knew about Lake's agency and the benefits he gave Bush* and violated NCAA legislation by lying about that knowledge and failing to report that knowledge to USC. No amount of circumstantial evidence about interactions between

24

McNair and Lake proved to the trial court what they spoke about or what McNair knew such that it would support the operative statement's finding that he did know. That the two men may have spoken, may have had a celebrity friend in common, and posed for the same photograph are manifestly not evidence that McNair "had knowledge of" the agency and improper benefits, which is the only way his denials would violate NCAA rules.

The trial court abuses its discretion in ruling on a new trial motion only if there is no reasonable basis for its ruling or the court committed legal error. (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 336.) The NCAA has failed to demonstrate an abuse of discretion.

## II. The declaratory judgment

It is well-established that an order granting a new trial vacates the entire judgment (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 302), with the result that the portions of the judgment that are not related to the new trial order must await review in an appeal from the final judgment. (*Id*. at p. 305.) In its reply brief, the NCAA acknowledges that we may consider the merits of its appeal from the declaratory judgment *if* we reverse the new trial order. As we conclude that the new trial order must be affirmed, we have no jurisdiction to consider the NCAA's challenge to the declaratory judgment.

25

## DISPOSITION

The order is affirmed.  The National Collegiate Athletic Association to bear the costs of appeal.

NOT TO BE PUBLISHED.


DHANIDINA, J.


We concur:


EDMON, P. J.


EGERTON, J.